T.C. Memo. 2011-89

UNITED STATES TAX COURT

JOSEPH B. WILLIAMS, III, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2202-08.                    Filed April 21, 2011.


In 1993 P established a British Virgin Islands
(BVI) corporation, A, and placed the shares in a BVI
trust of which he was the sole beneficiary.  P opened
accounts in the name of A with a bank in Switzerland.
P provided consulting, negotiation, and other services
to companies and governments, and his clients
transferred money into A's accounts to pay for those
services.  P did not report any of this income on any
U.S. Federal income tax return for 1993 through 2000,
except that in 2003 he amended his 1999 and 2000
individual income tax returns to report investment
income earned on the amounts in the Swiss bank
accounts.  P did not include the payments for services
in income on any of those original or amended returns.
Also in 2003 P pleaded guilty to one count of tax
evasion for all 8 years from 1993 through 2000 and to
one count of conspiracy to defraud the IRS for those
same years.

In 1996 P signed an agreement purporting to commit to purchasing works of art. The seller, S, ostensibly agreed to hold the art for 1 year before donating it on P's behalf to charity and promised that the art would cost P no more than 24 percent of the final appraised value of the art. S donated works of art on P's behalf in 1997, 1999, and 2000; P paid for the art close in time to the donations (within a year of each donation); and he claimed charitable contribution deductions for the full value determined in appraisals that S arranged.

By a notice of deficiency issued in 2007, R determined deficiencies in P's original returns for all 8 years, determining that P is liable for tax on the services and investment income deposited into A's accounts and allowing P deductions for the contributions of art only to the extent of P's basis in the art. R determined fraud penalties related to the unreported income deposited in A's Swiss bank accounts and also determined accuracy-related penalties on the disallowed portions of P's charitable contribution deductions.

Held: P is liable for tax on the net amounts deposited into A's accounts in each year, and P is liable for the fraud penalties on the underpayments resulting from this unreported income.

Held, further, P is entitled to charitable contribution deductions only in the amount of his basis in the art contributed, and he is liable for the accuracy-related penalties on the underpayments resulting from the disallowed deductions.

David H. Dickieson, for petitioner.

John C. McDougal, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, <u>Judge</u>:  The Internal Revenue Service (IRS) issued to petitioner Joseph B. Williams III a notice of deficiency pursuant to section 6212,[1] showing the IRS's determination of the following deficiencies and penalties for tax years 1993 through 2000:

|  |  | Penalties | |
| Year | Deficiency | Sec. 6663 | Sec. 6662 |
| 1993 | $417,652 | $313,038.00 | --- |
| 1994 | 304,740 | 226,206.75 | --- |
| 1995 | 417,354 | 313,015.50 | --- |
| 1996 | 1,572,673 | 1,179,504.75 | --- |
| 1997 | 809,620 | 511,143.00 | $25,619.20 |
| 1998 | 52,733 | 39,549.75 | --- |
| 1999 | 113,049 | 33,395.25 | 13,704.40 |
| 2000 | 120,391 | 74,093.25 | 4,320.00 |

Mr. Williams brings this case pursuant to section 6213(a), asking this Court to redetermine those deficiencies and penalties.[2]

The issues for decision are:[3]

---

[1]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code (Code, 26 U.S.C.) in effect for the years in issue, and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

[2]Although Mr. Williams and his wife filed joint Federal income tax returns for 1993 through 2000, the IRS determined that section 6015(c) applies to Meredith Williams and that she is not liable for the deficiencies determined for any of those years.

[3]In earlier opinions in this case, we held that this Court
(continued...)

1.  Whether Mr. Williams is individually liable for Federal income tax on the payments made to ALQI Holdings, Ltd. (ALQI), during each year in issue; or whether he is individually liable only for tax on the investment income earned during each year (on funds held and invested by ALQI), pursuant to sections 951(a) and 954(c).  We hold that his liability is not limited to tax on the investment income paid to ALQI each year; rather, he is liable for tax on the entire net amount deposited into the ALQI accounts during each year in issue.

2.  Whether section 6663 civil fraud penalties apply to the underpayments resulting from the unreported income from ALQI.  We hold that the fact of Mr. Williams's fraud is established by his criminal conviction, that he is collaterally estopped from denying that fraud, see supra note 3, and that he did not establish that any portion of his underpayment attributable to the unreported ALQI income is not attributable to fraud.

---

[3](...continued)
lacks jurisdiction to redetermine Mr. Williams's income tax liability for 2001, his liability for unassessed interest, and his liability for penalties for failing to file Forms TD F 90-22.1, Report of Foreign Bank and Financial Accounts (FBARs), Williams v. Commissioner, 131 T.C. 54 (2008); and we held that Mr. Williams's conviction for tax evasion under section 7201 for 1993 through 2000 collaterally estops him for each of those years from denying that for each of these years there was an underpayment of his income tax attributable to civil fraud for purposes of the statute of limitations and the section 6663(a) fraud penalty, Williams v. Commissioner, T.C. Memo. 2009-81.

3.    Whether Mr. Williams is entitled to charitable contribution deductions for his contributions of art in the amounts claimed--i.e., the appraised values of the art--or whether his deductions are limited by section 170(e) to his basis in the art donated.  We hold that his deductions are limited to his basis in the art.

4.    Whether Mr. Williams is liable for accuracy-related penalties on the underpayments resulting from his deducting the appraised value of the donated art rather than his basis in the art.  We hold that he is liable for the accuracy-related penalties.

FINDINGS OF FACT

The parties stipulated some of the facts, and we incorporate the stipulation of facts by this reference.  The record also includes the stipulated exhibits, the testimony offered at trial, and the exhibits admitted at trial.  When he filed his petition, Mr. Williams resided in Virginia.

Oil-related activities and Swiss bank accounts

Mr. Williams earned his undergraduate degree from the University of North Carolina and his law degree from New York University School of Law.  He began working in the corporate legal department of Mobil Oil Corp. (Mobil) around 1973.  Mr. Williams worked for Mobil in Saudi Arabia from 1979 to 1985, and while there he met Jean-Jaques Bovay, a banker representing

Banque Indosuez, a bank in Switzerland.[4]  He continued working for Mobil until 1998.  In the 1990s Mobil tasked Mr. Williams with developing strategic business relationships in Russia and some of the former Soviet republics, including Azerbaijan, Turkmenistan, and Kazakhstan.  When he retired from Mobil in 1998, Mr. Williams held the position of general manager for strategic business development and government crude, in which he bought and sold crude oil internationally on behalf of Mobil, and he assisted with the negotiation and closing of major business deals for Mobil.

At Mr. Williams's request, in 1993 Mr. Bovay arranged for the formation of ALQI in the British Virgin Islands.  The Swiss bank formed ALQI as a British Virgin Islands International Business Company, authorized to conduct business anywhere except the British Virgin Islands.

The record is unclear as to whether Mr. Williams directly owned the shares of ALQI or whether the shares were held in a British Virgin Islands trust of which Mr. Williams was the sole beneficiary.  The Swiss bank used Overseas Management Trust (B.V.I.), Ltd., to form ALQI, and Overseas Management appointed Saturn Corporate Services, Inc. (Panama), as the sole director of

---

[4]Credit Agricole Group acquired Banque Indosuez in 1996 and changed its name to Credit Agricole Indosuez.  For convenience, we will refer to the bank Mr. Williams used in Switzerland as the Swiss bank.

ALQI.  Saturn authorized the Swiss bank to establish accounts in ALQI's name.  Saturn operated as Mr. Williams's nominee, and Mr. Williams was the only operational director and officer of ALQI; only he had authority to act on behalf of ALQI, and only he could instruct the Swiss bank with respect to the ALQI accounts. The documents submitted to the Swiss bank to open the ALQI accounts identify Mr. Williams as the only beneficial owner of all assets deposited into ALQI's accounts.  Whether Mr. Williams owned ALQI directly or as the sole beneficiary of a trust, we find that he directly or indirectly owned and controlled all the shares of ALQI stock.

The Swiss bank also provided Mr. Williams and ALQI with a Swiss mobile telephone, credit cards, and the use of office space at the bank for business meetings.  The credit cards and mobile telephone were issued and billed in Mr. Williams's name.

Mr. Williams did not maintain formal books of account recording income and expenses related to his international consulting and services activity.  However, the Swiss bank maintained records of deposits, transfers, and payments involving the ALQI accounts.  Mr. Williams instructed the Swiss bank to draw on those accounts to pay the mobile telephone bills, the credit card bills, and various other bills, and to transfer funds at his direction.  The transfers included several $10,000 and $20,000 transfers from the Swiss bank to a branch of the same

bank in London, to be held for pickup by Mr. Williams. The payments included payments totaling $41,409.44 to a former Mobil secretary who had worked for Mr. Williams. A $15,000 gift to the to the wife of Mr. Williams's deceased father was also paid for from the ALQI accounts. Some of the credit card charges ALQI paid reflect Mr. Williams's vacationing with his children and a nearly $30,000 shopping spree in Paris, France. The instructions Mr. Williams sent to Mr. Bovay consistently refer to the Swiss bank account(s) as "my account"; when requesting transfers or payments from these accounts, Mr. Williams did not refer to them as ALQI's accounts or as corporate accounts. We find that Mr. Williams paid personal, family, and living expenses and made gifts to family and friends from the ALQI accounts.

Beginning in 1993 Mr. Williams found business opportunities separate from his work for Mobil, and he pursued those opportunities and earned fees for his consulting and negotiation services. One particular project he facilitated, on behalf of the Khazakhstan Government, was the building of a new pipeline from the Tengiz oil field in Kazakhstan through Russia to the Black Sea. Mr. Williams admits that none of his clients had written agreements with ALQI. He did not correspond or deal with his clients using the ALQI name. He performed services for these clients in his individual capacity and not on behalf of ALQI.

Alika Smekhova, a Russian actress, singer, and celebrity, worked as a consultant with Mr. Williams, translating at meetings and helping arrange introductions and appointments with Russian government officials. Beginning in 1996 Mr. Williams paid Ms. Smekhova a stipend of $5,000 to $10,000 per month from the ALQI accounts, and he also paid for her shopping in Paris. Mr. Williams did not pay himself a salary or commissions from ALQI, and he retained most of the amounts deposited into the ALQI accounts in the Swiss bank accounts; but, as noted, he made gifts and paid some personal expenses from the ALQI accounts.

ALQI had no written employment or other contracts with Mr. Williams or Ms. Smekhova, and neither of them was an employee of ALQI. ALQI did not have any staff and had no ability to perform oil- and pipeline-related consulting services without Mr. Williams's providing those services directly; and although Ms. Smekhova rendered services to Mr. Williams, she did not render services to Mr. Williams's clients on his or ALQI's behalf.

All amounts deposited into the ALQI accounts during 1993 through 2000 were received for services that Mr. Williams rendered to third parties, generally in connection with the negotiation of oil- and pipeline-related contracts. Ms. Smekhova facilitated Mr. Williams's provision of services by translating and making introductions. The ALQI accounts received

approximately $8 million in deposits between 1993 and 2000.
Between 1993 and 2000, deposits (payments for services) and
earnings (interest, dividends, and capital gains) in the ALQI
accounts included the following:[5]

| Year | Deposits | Earnings | Total |
|-------|-----------|-----------|------------|
| 1993 | $993,837 | $35,754 | $1,029,591 |
| 1994 | 693,699 | 58,781 | 752,480 |
| 1995 | 887,964 | 110,759 | 998,723 |
| 1996 | 3,752,879 | 164,884 | 3,917,763 |
| 1997 | 1,344,637 | 326,254 | 1,670,891 |
| 1998 | 41,248 | 92,124 | 133,372 |
| 1999 | --- | 109,168 | 109,168 |
| 2000 | --- | 256,235 | 256,235 |
| Total | 7,714,264 | 1,153,959 | 8,868,223 |

Reporting ALQI's income on Mr. Williams's tax returns

On his Federal income tax returns for 1993 through 2000,
Mr. Williams did not report any of the services income deposited
into the ALQI accounts, nor did he report any of the interest,
dividends, or capital gain income earned on those deposits.  He
did not inform his return preparer of the accounts in the Swiss
bank or of his interest in ALQI, nor did he discuss with his

_____

[5]The parties stipulated that the deposits and earnings
listed are "net of all expenses".  Mr. Williams does not allege
deductible business expenses beyond any to which the parties
stipulated.  We accept the parties' stipulation (correcting
errors of arithmetic) and refer to the net income or amounts
deposited without analyzing any deductions to which the parties
have agreed.

return preparer whether he was required to report income from ALQI for the years in issue.

On November 14, 2000, at the request of the United States Government, the Government of Switzerland froze the ALQI accounts. Mr. Williams disclosed his ownership interest in ALQI and the existence of the Swiss bank accounts on his Federal income tax return for 2001, which he filed in 2002--after the Swiss authorities froze the accounts.[6]

In 2003 Mr. Williams filed amended Federal income tax returns for 1999 and 2000. Mr. Williams also had prepared and entered into evidence amended returns for 1993 through 1998. Mr. Williams's counsel provided unsigned copies of these returns to the IRS agents during the examination. These unsigned amended returns were not filed with the IRS.

On these unfiled amended returns, Mr. Williams reported additional income (representing ALQI's capital gains, dividends, and interest), and he reported net increases in income as follows:

---

[6]The record does not reflect what ALQI income Mr. Williams reported on his 2001 return (services income, investment income, both, or neither). The 2001 tax year is not before us in this case. See supra note 3.

| Year | Interest | Dividends | Short-term capital gains | Long-term capital gains | Total earnings | Increased income |
|------|----------|-----------|--------------------------|-------------------------|----------------|------------------|
| 1993 | $8,722   | $135      | -0-     | $26,608 | $35,465 | $35,466 |
| 1994 | 30,590   | 9,379     | 22,718  | 1,952   | 64,639  | 64,639  |
| 1995 | 101,783  | 2,093     | 2,184   | 3,777   | 109,837 | 109,837 |
| 1996 | 135,492  | 8         | 19,961  | 3,659   | 159,120 | 159,120 |
| 1997 | 207,981  | -0-       | 102,004 | -0-     | 309,985 | 309,985 |
| 1998 | 19,933   | 42        | 5,920   | -0-     | 25,895  | 25,895  |
| 1999 | 53,199   | 101       | 39,879  | 67,495  | 160,674 | 160,674 |
| 2000 | 190,249  | 80        | 995     | 708,626 | 899,950 | [1]751,848 |

[1]The record does not explain why the increased income reported on the amended return for 2000 was less than the earnings reported on the amended return.  On this and subsequent tables, we do not correct discrepancies that apparently result from rounding.

Mr. Williams's amended returns included Form 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, and on Schedule C, Income Statement, of those forms he reported income, earnings, and deductions as follows, which he attributed to ALQI:

| Year | Gross receipts or sales | Passive income (earnings) | Deductions | Net income |
|------|------|------|------|------|
| 1993 | $1,467,092 | $35,754 | $12,123 | $1,490,723 |
| 1994 | 725,000 | 58,781 | 20,097 | 763,684 |
| 1995 | 940,000 | 110,759 | 8,753 | 1,042,007 |
| 1996 | 3,681,000 | 164,884 | 134,442 | 3,711,442 |
| 1997 | 1,473,000 | 326,254 | 89,718 | 1,709,536 |
| 1998 | 25,000 | 92,124 | 83,386 | 33,738 |
| 1999 | -0- | 255,023 | 94,349 | 160,674 |
| 2000 | -0- | 899,951 | -0- | 899,951 |

The net change to his own income that Mr. Williams reported on these amended returns did not include any of the gross receipts he listed for ALQI on Forms 5471, and the 2000 Form 5471 does not shed any light upon the discrepancy noted above with respect to increased income reported for 2000.  On the amended returns Mr. Williams included in income only the passive income earned on the deposits and investments in ALQI's accounts at the Swiss bank; none of these amended returns includes in Mr. Williams's income any of the services income transferred or deposited into the ALQI accounts.

As noted, Mr. Williams prepared but did not file amended returns for 1993 through 1998, even though each showed additional income and additional taxes owed.  However, his amended returns for 1999 and 2000, which he did file, reported additional tax due

of $40,462 and $203,148, respectively, and Mr. Williams paid those additional amounts.[7]

Criminal prosecution

On April 14, 2003, the Department of Justice filed a two-count superseding criminal information charging Mr. Williams with one count of conspiracy to defraud the United States and the IRS and one count of tax evasion for the period from 1993 through 2000. On June 12, 2003, Mr. Williams pleaded guilty to conspiring to defraud the United States and the IRS and to evading taxes for each year from 1993 through 2000.

In connection with entering his guilty plea, Mr. Williams allocuted as follows:

> In 1993, with the assistance of a banker at Bank Indosuez, I opened two bank accounts in the name of a corporation ALQI Holdings, Ltd. ALQI was created at that time as a British Virgin Islands Corporation. The purpose of that account was to hold funds and income I received from foreign sources during the years 1993 to 2000. [Emphasis added.]

> Between 1993 and 2000, more than seven million dollars was deposited in the ALQI accounts and more than $800,000 in income was earned on those deposits.

> I knew that most of the funds deposited into the ALQI accounts and all the interest income were taxable income to me. However, [on] the calendar year tax returns for '93 through 2000, I chose not to report the income to my--to the Internal Revenue Service in order to evade the substantial taxes owed thereon, until I filed my 2001 tax return. [Emphasis added.]

---

[7]The IRS disputes that the amended returns for 1999 and 2000 correctly reported the appropriate method of taxing ALQI's income.

I also knew that I had the obligation to report to the IRS and/or the Department of the Treasury the existence of the Swiss accounts, but for the calendar year tax returns 1993 through 2000, I chose not to in order to assist in hiding my true income from the IRS and evade taxes thereon, until I filed my 2001 tax return.

Some of the payments I received in the ALQI accounts, including a two million payment I received in 1996, were paid to me by people, organizations or governments with whom I did business on Mobil's behalf while I [was] an employee of Mobil Oil. I did not disclose these business relationships to Mobil Oil, although I understood I had an obligation to do so.

I suspect people, organizations, governments paying the money to me were not notifying Mobil Oil of the payments. None of the people, organizations or governments who made payments into my ALQI accounts provided any tax reporting documents to me or to the IRS.

Similarly Bank Indosuez provided me with no tax reporting documents for the interest and other income earned within the ALQI accounts.

Over the course of several years I came to expect that the people with whom I dealt with regularly regarding the payments into the ALQI accounts would not provide tax reporting information to the United States government regarding these transactions, thus allowing me to evade taxes on the payments received.

I knew what I was doing was wrong and unlawful. I, therefore, believe that I am guilty of evading the payment of taxes for the tax years 1993 through 2000. I also believe that I acted in concert with others to create a mechanism, the ALQI accounts, which I intended to allow me to escape detection by the IRS. Therefore, I am--I believe that I'm guilty of conspiring with the people would [sic] whom I dealt regarding the ALQI accounts to defraud the United States of taxes which I owed.

The judge of the U.S. District Court for the Southern

District of New York accepted Mr. Williams's allocution and plea

and sentenced him to 46 months' incarceration.   Mr. Williams and the Government stipulated that the readily provable tax loss the United States suffered as a result of Mr. Williams's tax evasion was at least $3.512 million, and they expected the District Court to order restitution in that amount.  The District Court ordered Mr. Williams to pay the entire balance in the ALQI accounts to the Clerk of the Court, with $3.512 million of that amount paid to the IRS as restitution and the balance held by the clerk pending resolution of the amounts Mr. Williams owes the IRS for 1993 through 2000.

The Swiss bank transferred a total of $7,943,051.33 to the District Court in November 2003, and the clerk credited $3.512 million to the IRS on January 7, 2004.  The IRS has held that amount pending the resolution of this case.  The clerk has held the balance of the funds pending the final determination of Mr. Williams's liability for the years in issue, including interest and penalties.

The Department of Corrections released Mr. Williams on May 21, 2006.

Charitable contributions

Sometime in the summer of 1996, Mr. Williams began speaking with personnel of Abbey Art Consultants, Inc. (Abbey), a corporation in New York City, about buying art at a discount and donating it at full fair market value to charitable institutions.

On December 10, 1996, Mr. Williams signed an agreement with

Abbey[8] which refers to Mr. Williams as "Client" and provides, in

relevant part:

1.  Client desires to purchase from Abbey the monetary
quantity of Art specified in Paragraph 2 below.  The
specific items purchased by the Client will be
described in written appraisals prepared by a qualified
appraiser selected by Abbey.  The appraisal(s) will be
submitted to the Client when the Client receives
physical possession of the Art or when the Art is
donated to a charitable institution.

2.  The total purchase price or consideration for the
Art shall be $72,000.00 provided, however, that the
total purchase price shall not exceed twenty-four (24%)
percent of the cumulative appraised fair market value
of the Art purchased herein, as determined by the
qualified appraiser selected by Abbey.

3.  The purchase price shall be paid to Abbey in the
following manner:

    a)  ten (5%) [sic] percent of the total purchase
    price $3,600.00 shall be paid by check at the
    signing of this agreement. * * *  Said monies
    shall be held in an escrow account pending
    satisfaction of the provisions contained in this
    Agreement.

    b)  the balance of the price shall be paid by good
    check on or before the time when client receives
    physical possession of the Art or when the Art is
    delivered to and accepted [by the] charitable
    institution where the art is being donated.  In
    the event that Abbey is unable to facilitate the
    donation of the Art, client may request physical
    possession of the Art or, monies previously paid,
    in which case Abbey shall immediately comply with
    such request.

    *       *       *       *       *       *       *

_____

[8]Mrs. Williams also signed the agreement.  However, she is
not a party to this case.  See supra note 2.

5.  Within thirty (30) days after the Client has paid to Abbey the deposit payment of the purchase price, the Client shall notify Abbey of the Client's wishes with regard to the dispensation [sic] of the Art.  Client may elect one of the following:

    a)  to take physical possession of the Art, in which case Abbey will package and ship the Art to the Client at Abbey's expense, provided that full payment has been received, or

    b)  to retain Abbey as its agent to facilitate the donation of the Art to a charitable institution(s), in which case Abbey at its sole cost and expense will arrange the donation and handle all the requisite paperwork needed to consummate the desired donation, including the packaging and shipping of the Art to the charitable institution(s) after the required holding period of one (1) year.

6.  In the event Client fails to make any payment required herein for the purchase of the Art at any time prior to the time Client executes a Bill of Sale transferring ownership of the Art to a charitable institution, Abbey's sole remedy shall be to retain as liquidated damages all previous payments Client has made toward the purchase of the Art and, in addition, to reclaim ownership of the Art. * * *[9]

7.  In the event Client elects to donate the Art to a charitable institution(s), upon such election Client may list three charitable institutions Client wishes to be the possible donees.  Abbey will endeavor to facilitate the donation to one of the specified institutions; provided, however, that if Abbey in its sole opinion determines that a donation to the

---

[9]Paragraph 6 of the agreement included the following sentence, which was crossed out by hand and initialed:

All payments owing by Client after Client's execution of the Bill of Sale shall be subject to Abbey's right to require specific performance of Client with respect to Clients [sic] obligation to pay Abbey the full balance of the purchase price.

requested institution(s) is not practical, Abbey may without prior notice to Client, facilitate the donation of the Art to qualifying charitable institution(s) chosen by Abbey.

8.  If at any time after the donation of the Art to qualifying charitable institution(s) any governmental body or panel makes a final determination that the cumulative fair market value of the Art herein purchased is less than the value which is reflected in the Appraisal(s), and, as a result of such determination, the tax benefit to the Client resulting from such donation is reduced, Abbey, within thirty (30) days of the submission to Abbey by the Client of written documentation evidencing the adjudicated reduction of the original fair market value of the Art, shall pay to the Client in cash or by check an amount of monies equal to the percentage of the dollars paid for each dollar the fair market value of the Art has been reduced; provided however, that before doing so Abbey reserves the right to lawfully challenge any such reduction.

9.  This agreement shall be interpreted under the laws of the State of New York.

*       *       *       *       *       *       *

12.  This Agreement contains the entire agreement between the respective parties hereto and there are no other provisions, obligations, representations, oral or otherwise, of any nature whatsoever.

Thus, under this agreement--

- Mr. Williams expressed interest in paying $72,000 for art, but he committed only to pay $3,600--the deposit paid with the agreement.

- Abbey promised to provide a qualified appraiser and to provide art with a purchase price of no more than 24 percent of the appraised fair market value.

- Mr. Williams was not selecting specific pieces; rather, Abbey agreed that when Mr. Williams took possession of art or when it was donated to charity, Abbey would identify and describe that art in an appraisal.

- Abbey agreed to bear all the expense--including paperwork, appraisal, packing and shipping costs--of donating the art to charity, and to refund all of Mr. Williams's payments if it was unable to facilitate the donation.

- Abbey agreed that its sole remedy for Mr. Williams's non-payment would be to retain any payments already received and to retake possession of the art. (I.e., Abbey could not force Mr. Williams to perform, and the only risk Mr. Williams bore for non-performance was the loss of his deposit.)

- Although Mr. Williams could propose donees, Abbey retained discretion to select the donee.

- Abbey agreed to share the risk of inflated appraised values by promising a pro-rata refund of the discounted purchase price.

## 1997 Contribution

In November and December of 1997 (i.e., almost a year after the date of the agreement between Abbey and Mr. Williams), Abbey arranged for appraisals of three different sets of art, and

Mr. Williams introduced at trial the following appraisals, reciting the following fair market values:

| Appraisal date | Appraiser | Value of art |
|---|---|---|
| November 17, 1997 | Shari Cavin | $34,800 |
| November 23, 1997 | Lawrence Roseman | 18,150 |
| December 1997 | Kenneth Jay Linsner | 372,675 |
| Total | | 425,625 |

On December 23, 1997, Mr. Williams signed a deed of gift to Drexel University, and a representative of Drexel University signed the deed to accept the gift on December 29, 1997. The deed provides a very brief description of the art described in the November and December 1997 appraisals, and it recites a total appraised value of $425,625--i.e., an amount greater than the $300,000 contemplated in the agreement.[10] The record includes no evidence as to when Abbey first acquired the art appraised in late 1997.

The record includes a letter from Abbey to Mr. Williams, dated December 29, 1997, reporting that Abbey had delivered his donation to Drexel. The letter included an undated invoice that recites a purchase date of December 10, 1996 (i.e., the date of the agreement), a description of "art objects as attached", appraised value of $425,000, and purchase price of $102,000. The

---

[10]The agreement recited a total purchase price of $72,000 and stated that the purchase price shall not exceed 24 percent of the cumulative appraised fair market value of the art. ($72,000/24 percent) = $300,000.

invoice lists a $3,600 deposit, and indicates a balance due of $98,400 (an amount obviously greater than the $72,000 required in the agreement, but consistent with the invoice purchase price of $102,000 and also consistent with the discount promised in the agreement; $102,000 is 24 percent of the $425,000 appraised value). The December 29, 2007, letter asks Mr. Williams to remit $98,400 in the enclosed envelope and instructs him to date and tender his check in 1997, "the year of the donation". Finally, the letter promises that early in 1998 Abbey would send Mr. Williams the original appraisals and the required IRS forms signed by the appraisers and Drexel. Mr. Williams paid Abbey $98,400 before the end of 1997. (It would appear that at this point the agreement had been more than fulfilled, but Mr. Williams and Abbey behaved otherwise in 1999 and 2000, as we show below.)

On his 1997 Federal income tax return, Mr. Williams claimed deductions for the following charitable contributions:

| Item | Amount |
|------|--------|
| Gifts by cash or check | $2,000 |
| Gifts other than by cash or check | 425,625 |
| Total | 427,625 |

Mr. Williams's return preparer informed him that so long as he had a 1-year holding period and appropriate appraisals of the art, his charitable contribution deduction should not pose a problem.

1999 contribution

Mr. Williams wrote Abbey on December 17, 1999, stating:

> I have just returned from a trip to London and would like your assistance once again to complete another gift of art. As I am sure you remember, in December 1996, I purchased from Abbey Art approximately $800,000 plus[11] of appraised value art and antiquities originating from South America, South East Asia, Haiti and North Africa. As you also know, I gifted in [1997][12] $425,000 in appraised value of art and antiquities to Drexel University in Philadelphia, Pa. with your assistance. The remaining art has in the meantime been stored with you in your wharehouse [sic]. I would now like to gift approximately $250,000.00 of the remaining art to Florida International University in Miami for the Tax Year 1999 and ask your assistance in completing this gift ASAP. I also ask you to continue to wharehouse [sic] the remaining art that I previously purchased.
>
> I hereby enclose a check in the amount of $57,500 made out to Abbey Art which I understand should cover the expenses of the shipping, packing, warehousing, updated appraisals and any other expenses related to the gift of this art to FIU. I would appreciate an itemized list of these expenses once you have completed the delivery of the gift.

Mr. Williams signed the letter and included a check for $57,500.

In December 1999 Abbey arranged for appraisals of two different sets of art, and Mr. Williams introduced at trial the following appraisals, reciting the following fair market values:

---

[11]The record does not show any basis for this "$800,000 plus" figure. The agreement between Abbey and Mr. Williams provided for art with a total value of $300,000.

[12]On the photocopy of the December 17, 1999, letter introduced into evidence, the last digit of the year Mr. Williams references is illegible, but we infer that he refers to 1997.

| Appraisal date | Appraiser | Value of art |
|---|---|---|
| December  3, 1999 | Shari Cavin | $15,100 |
| December 12, 1999 | Jane Werner-Aye | 235,425 |
| Total | | 250,525 |

The record does not explain why the December 1999 appraisals both predate Mr. Williams's December 17, 1999, letter instructing Abbey to facilitate a donation for 1999.  The record includes no evidence as to when Abbey first acquired the art appraised in late 1999.

On December 21, 1999, Mr. Williams signed a deed of gift reciting his donation of art appraised at $250,525 to the art museum at Florida International University, and a representative of the museum at the university signed the deed to certify receipt and acceptance of the donation on December 23, 1999.

Mr. Williams claimed a charitable contribution deduction for the following contributions for 1999:

| Item | Amount |
|---|---|
| Gifts by cash or check | $3,874 |
| Gifts other than by cash or check | 250,825 |
| Total | 254,699 |

The non-cash charitable contribution for 2000 includes $300 for clothing that Mr. Williams reported donating to charity.

2000 contribution

With two separate checks, Mr. Williams paid Abbey $4,600 and $17,158 toward a 2000 contribution of art. Other than the already fulfilled December 1996 agreement, the record does not include any agreement pursuant to which Mr. Williams might have made these payments, and he does not allege that there was another written agreement.

In November 2000 Abbey arranged the appraisal of another set of art, and at trial Mr. Williams introduced the following appraisal, reciting the following fair market value:

| Appraisal date | Appraiser | Value of art |
|---|---|---|
| November 16, 2000 | Jane Werner-Aye | $98,900 |

Mr. Williams introduced a deed of gift reciting his gift of $98,900 of art to Drexel University in December 2000. His signature is dated December 15, 2000, and a representative of the university appears to have signed the document on December 24, 2000. The record includes no evidence as to when Abbey first acquired the art appraised in late 1999.

Mr. Williams claimed a deduction for the following charitable contributions for 2000:

| Item | Amount |
|---|---|
| Gifts by cash or check | $1,135 |
| Gifts other than by cash or check | 102,825 |
| Total | 103,960 |

The non-cash charitable contributions for 2000 include $500 for clothing and $3,425 for a BMW automobile Mr. Williams reported donating to charity.

On December 9, 2000, Abbey sent Mr. Williams a letter that stated:

> I am writing to remind you that we still have art and antiquities held in a segregated manner in our warehouse located in New York City from 1997. We thank you for your recent $1,000 check for storage etc. Sometime in the first half of 2001 we will send you an itemized bill and a description of your objects which remain. Based upon our last inventory we believe that you still have over $200,000 worth of appraised items.
>
> In the event you wish to gift objects in 2001, we would be pleased to work with you in this regard.

We find that Mr. Williams paid the following amounts and that his costs represent the following percentages of the appraised values of the art he donated:

| Payment date | 1997 gift | 1999 gift | 2000 gift | Percent of appraised value |
|---|---|---|---|---|
| 12/10/1996 | $3,600 | | | |
| 12/26/1997 | 98,400 | | | |
| Total | 102,000 | | | 23.96 |
| 12/21/1999 | | $57,500 | | 22.95 |
| 03/17/2000 | | | $4,600 | |
| Illegible | | | 17,158 | |
| Total | | | 21,758 | 22.00 |

Notice of deficiency

During Mr. Williams's incarceration, the IRS examined his returns for the years in issue. The IRS issued the notice of deficiency for 1993 through 2000 on October 29, 2007. The issues now before us for decision were addressed as follows in the notice of deficiency:

Unreported foreign income

The IRS determined that the amounts deposited into the ALQI accounts (not only the earnings on deposits and investments held at the Swiss bank but also the consulting fees paid for services rendered, net of allowable expenses) were includable taxable income to Mr. Williams during the year of deposit, that he failed to report that income on his returns, and that pursuant to section 6663, the civil fraud penalty applies to all of that omitted income.[13]

_____

[13]The notice of deficiency appears to determine deficiencies relative to the original returns Mr. Williams filed for 1999 and 2000, not the amended returns he filed in 2003 for 1999 and 2000. We presume that the IRS is holding the payments made with Mr. Williams's amended 1999 and 2000 returns as advance payments against his liabilities--along with the $3,512,000 restitution payment.

Moreover, certain adjustments in the notice of deficiency result from mechanical application of limitations based on Mr. Williams's adjusted gross income for each year. These include a reduction in allowed exemptions for 1993 and limitations in itemized deductions. These adjustments are computational and do not require further analysis.

Disallowed charitable contribution deductions

In the notice of deficiency, the IRS stated:

The amount shown on your return as a deduction for charitable contributions is not allowable in full because it has not been established that the total amount was paid during the tax year or that the unallowable items met the requirements of Section 170 of the Internal Revenue Code.  As a result, your contributions deduction is decreased in tax year 1997, 1999, and 2000.

The IRS disallowed the amounts shown below and determined accuracy-related penalties under section 6662 on the underpayments resulting from the disallowed charitable contribution deductions:[14]

| Year | Claimed | Allowed | Disallowed | Accuracy-related penalty |
|------|---------|---------|------------|--------------------------|
| 1997 | $427,625 | $104,150 | $323,475 | $25,619.20 |
| 1999 | 254,699 | 61,796 | 192,903 | 13,704.40 |
| 2000 | 103,960 | 26,818 | 77,142 | 4,320.00 |

Trial

At trial in Washington, D.C., on September 28, 2009, Mr. Williams testified, and he called as a witness Mr. Donald Williamson, the C.P.A. whom Mr. Williams's lawyers retained in 2002 to assist in the preparation of tax returns reporting Mr. Williams's ownership interest and income from ALQI.  Mr. Williams

---

[14]The amounts the IRS allowed include not only the amounts Mr. Williams paid for the art he donated through Abbey but also the amounts he claimed for other non-cash charitable contributions.

did not call any representative from Abbey or anyone affiliated with ALQI or involved with his consulting activities, nor did he call the return preparer who prepared his original Federal income tax returns for 1993 through 2000.

## OPINION

The Commissioner's deficiency determinations are generally presumed correct, and Mr. Williams, as the petitioner in this case, has the burden of establishing that the deficiencies determined in the notice of deficiency are erroneous. See Rule 142(a). Similarly, Mr. Williams bears the burden of proving he is entitled to any disallowed deductions that would reduce his deficiency. See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).[15]

Conversely, the Commissioner has the burden of proof with respect to the issue of fraud with intent to evade tax, and that burden of proof must be carried by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Section 6663(b) provides that a determination that any portion of an underpayment is attributable to fraud results in the entire underpayment's being treated as

---

[15]Under certain circumstances the burden of proof can shift to the Commissioner with respect to factual disputes, pursuant to section 7491(a). However, Mr. Williams does not contend that the burden has shifted, and the record does not suggest any basis for such a shift. For example, Mr. Williams has not demonstrated compliance with the requirements of section 7491(a)(2)-- specifically, substantiating items and maintaining required records.

attributable to fraud, except any portion the taxpayer proves is not so attributable.

## I. Consulting fee income

### A. The parties' contentions

Mr. Williams contends that his amended returns properly report his income from the Swiss bank accounts he opened in 1993 and maintained throughout the years in issue. He maintains that he is liable for tax only on the investment earnings realized during those years on the amounts deposited and invested in the ALQI accounts; and he maintains that because he is liable for tax only on that omitted passive income, he is therefore liable for the civil fraud penalty only as to the deficiencies resulting from the omission of that passive income. Mr. Williams concedes that sections 951(a) and 954(c) require that he include in income each year the earnings on deposits and investments in the Swiss bank accounts.

The IRS agrees, of course, that the passive income earned on the ALQI accounts is taxable to Mr. Williams in each year earned. However, the IRS also contends that the consulting fee income-- i.e., the corpus of the ALQI accounts--is taxable to Mr. Williams--because it was his income and not ALQI's, or, in the alternative, because of ALQI's status as a controlled foreign corporation. The IRS contends that even if the consulting income is properly attributable to ALQI, it is taxable to Mr. Williams

pursuant to sections 951(a) and 954(c) because Mr. Williams was a related person to ALQI; that to the extent ALQI performed any services, ALQI performed those services "for or on behalf of" Mr. Williams as that concept is defined in 26 C.F.R. section 1.954-4(b)(1)(iv), Income Tax Regs.; and that but for Mr. Williams's substantial assistance, ALQI could not have performed any of those services.

Mr. Williams counters that he is not liable for tax on the consulting fees paid into the ALQI accounts until those amounts were distributed to him (which did not occur during the years in issue) because (1) ALQI is a legitimate corporation and ALQI provided the services, (2) the income from those services is not foreign base company services income under section 954(e), and (3) section 1.954-4(b)(1)(iv), Income Tax Regs., is invalid.

The IRS defends section 1.954-4(b)(1)(iv) as a valid interpretive regulation. As a result, the IRS contends that all the services income paid to ALQI during the years in issue is foreign base company services income and that income, net of allowable expenses, see supra note 5, is taxable to Mr. Williams in the year it was deposited into the ALQI accounts.

The IRS further contends that because Mr. Williams evaded tax both on the investment income earned on the ALQI deposits and on the services income deposited into the ALQI accounts during the years in issue, he is liable for civil fraud penalties on the

entire underpayment resulting from the investment income and the services income he omitted in 1993 through 2000.  As discussed, supra note 3, Mr. Williams's conviction estops him from denying his liability for civil fraud.  This entire underpayment is deemed attributable to fraud and subject to the 75-percent penalty unless he proves some part of the underpayment is not attributable to fraud.  See sec. 6663(a) and (b).

B.  Discussion

We have found that the consulting fees deposited into ALQI's accounts were in fact the income of Mr. Williams, funneled through ALQI's bank accounts only in order to (unsuccessfully) evade tax.  During his allocution for his guilty plea, Mr. Williams admitted that the purpose of opening the ALQI accounts "was to hold funds and income I received" and that "most of the funds deposited into the ALQI accounts and all the interest income were taxable to me",[16] and it is little wonder that he made this admission.  (Emphasis added.)  He had no

_____

[16]Respondent contends that Mr. Williams's guilty plea collaterally estops him from denying that the consulting income is taxable to him.  However, we have held that, even after the application of collateral estoppel, "the amounts of the deficiencies of tax and penalties for 1993 through 2000, and the issue of accuracy-related penalties, remain for trial", Williams v. Commissioner, T.C. Memo. 2009-81, slip op. at 21 (emphasis in original), since that would require addressing subordinate issues as to which collateral estoppel does not clearly apply.  We therefore treat Mr. Williams's allocution testimony not as something that estops his contentions but as evidence.  It is, however, weighty evidence that he was not able to plausibly contradict at trial.

employment contract with ALQI and reported no wages from ALQI; and the consulting clients did not have agreements with ALQI and did not even have any awareness of ALQI. Apart from his own general testimony, he presented no evidence that any client even knew that ALQI existed. The clients were Mr. Williams's clients, and their payments were for him.

It is apparently true that Mr. Williams and his banker directed his earnings to an ALQI account, but that fact does not excuse him from liability for tax on his earnings. His use of ALQI was, at most, an impermissible assignment of income. See Lucas v. Earl, 281 U.S. 111 (1930); Vercio v. Commissioner, 73 T.C. 1246, 1253 (1980) ("income must be taxed to the one that earns it").

Mr. Williams resists this conclusion by arguing that the IRS has not established that ALQI was a sham, and by pointing out that the tax law respects the existence of corporations. See Moline Props., Inc. v. Commissioner, 319 U.S. 436 (1943). A corporation is by definition a fictitious legal person, but Mr. Williams is right that we honor this legal fiction. Thus, when a corporation enters into a contract and becomes entitled to compensation under the contract, we understand that it is the corporation (and not its owners or principals) that is the party to the contract and that is entitled to receive (and is obliged to pay tax on) the income generated by that contract.

However, Mr. Williams misses the mark when he resists a "sham" contention that the IRS did not make and did not need to make. We assume that ALQI is a real corporation and would be the taxpayer responsible for any income that it earns. That assumption is unhelpful here to Mr. Williams, because ALQI simply did not earn the income at issue. The difficulty that Mr. Williams's position meets is not that ALQI is treated as a sham but that ALQI was not a party to the consulting agreements that produced the income. We would respect ALQI as a fictitious legal person, but we do not assume the existence of factually fictitious agreements between ALQI and Mr. Williams's clients. This is not an instance in which we sham a corporation, or invoke substance over form, in order to deem an individual taxpayer to be the actual recipient of money nominally earned by a corporation; rather, in this instance ALQI can be assumed to have its own valid, legal existence, but we are missing both the substance and the form of consulting agreements that involve ALQI. Mr. Williams earned consulting fees from his clients, and ALQI's only role was to be a conduit for Mr. Williams's earnings (to evade tax).

Mr. Williams's contention that Ms. Smekhova and his Swiss bankers also provided valuable services is misplaced. We assume that they provided assistance to Mr. Williams's consulting activity, but there is no evidence that they provided any

services to Mr. Williams's clients, nor any evidence that ALQI contracted with the bankers or Ms. Smekhova to provide those services on ALQI's behalf. Mr. Williams provided all the consulting services to his clients, and he directed his clients to deposit his compensation into Swiss bank accounts that belonged to ALQI. The fact that Mr. Williams's business and personal expenses were paid out of these same Swiss bank accounts does not prove that his clients contracted with ALQI or that ALQI was anything other than the receptacle into which Mr. Williams diverted his consulting income. We therefore hold Mr. Williams liable for the consulting fee income deposited into the ALQI accounts.

That being the case, we need not reach the IRS's alternative argument--i.e., that even if the income was earned by ALQI, Mr. Williams owed tax on it pursuant to the controlled foreign corporation provisions of subchapter F of the Code. Resolving that alternative theory would require us to address issues (such as Mr. Williams's challenge to the validity of the regulation) that we need not reach in order to decide the case.

II. Civil fraud penalty

Mr. Williams concedes that he is liable for tax on the ALQI investment income he omitted, and we have found that he is also liable for tax on the net services income. His conviction for tax evasion for 1993 through 2000 satisfies the IRS's burden of

proving fraud and estops him from denying the fact that he committed tax fraud in those same years. Mr. Williams is liable for the civil fraud penalty except to the extent that he proves part of the underpayment was not attributable to fraud. See sec. 6663(a) and (b).

Mr. Williams has not shown that his failure to report any of the ALQI income was not attributable to fraud. Therefore, the civil fraud penalty applies to the entire underpayment related to his omitted consulting fee and investment income for each year from 1993 through 2000.

III. Charitable contribution deductions

A. The parties' contentions

Mr. Williams contends that he signed the art purchase agreement with Abbey in December 1996, that he obligated himself in that agreement (and oral agreements that preceded his signing the agreement) to purchase all the art he donated in 1997, 1999, and 2000, that Abbey segregated art appraised at approximately $800,000 in its warehouse in 1996 on the basis of the 1996 agreement, that he owned all of that art as of December 1996, and that he is entitled to charitable contribution deductions for the appraised values of the art as claimed on his 1997, 1999, and 2000 returns.

Mr. Williams further contends that his return preparer approved his deducting the appraised fair market values, provided

that he held the art for more than 1 year and the art was properly appraised; and he argues that therefore, even if he is not entitled to the charitable contribution deductions in full, he is not liable for any accuracy-related penalties.

The IRS does not challenge the fact that Mr. Williams and Abbey signed the agreement, that Mr. Williams made the payments he alleges, that Abbey made the gifts on Mr. Williams's behalf, that the recipients of the gifts were qualified charities, that the appraisers' valuations were reasonable, or that Mr. Williams complied with the procedures for substantiating and reporting the charitable contribution deductions. However, the IRS contends that Mr. Williams did not own the specific art he donated for more than a year before the dates of his gifts of that art and that therefore section 170(e) limits Mr. Williams's donation to his basis in the art, rather than the fair market values of the art.

The IRS further contends that Mr. Williams is liable for accuracy-related penalties for the underpayments resulting from the disallowed portions of his charitable contribution deductions.

B.  Statutory framework

Section 170(a)(1) generally allows a deduction for any charitable contribution made during the tax year, but the deduction is allowable only if the contribution is verified under

regulations provided by the Secretary.  A charitable contribution includes a contribution or gift to or for the use of a government organization for public purposes or to a charitable organization. Sec. 170(c).

Generally, the amount of the charitable contribution is the fair market value of the contributed property at the time of donation.  26 C.F.R. sec. 1.170A-1(a), (c)(1), Income Tax Regs.

In some situations involving the donation of appreciated property, the general rule for determining the amount of a charitable contribution is modified.  Section 170(e)(1)(A) provides:

> SEC. 170(e).  Certain Contributions of Ordinary Income and Capital Gain Property.--
>
> (1)  General rule.--The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by * * *
>
> (A)  the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution) * * * .

Thus, the effect of section 170(e)(1)(A) is to permit the deduction of long-term capital gain appreciation but, when the contributed property is not long-term capital gain property, to limit the deduction to the taxpayer's basis at the time of

contribution.  See <u>Lary v. United States</u>, 787 F.2d 1538, 1540 (11th Cir. 1986).

Section 1221(a) defines capital assets, and the art at issue qualified as a capital asset in Mr. Williams's hands.  Section 1222(3) defines long-term capital gain as "gain from the sale or exchange of a capital asset held for more than 1 year".  It follows that when a taxpayer donates appreciated art that he held for 1 year or less, the amount of the deduction must be determined with regard to section 170(e)(1)(A); i.e., the deduction is limited to the taxpayer's basis, rather than the art's (higher) fair market value.

C.    <u>Discussion</u>

As noted, the IRS challenges only Mr. Williams's claim that he owned the art for more than a year before the donation. Mr. Williams alleges that he committed to purchasing art from Abbey, and he argues that his holding period for the art began in December 1996 when he and Abbey executed the agreement.

"Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked."  <u>United States v. Heller</u>, 866 F.2d 1336, 1341 (11th Cir. 1989).  Accordingly, although the parties titled the agreement "Art Purchase Agreement", we will consider the rights, duties, and obligations the parties actually assumed when they executed the agreement--whatever its title.

The agreement clearly states that Mr. Williams paid $3,600 to Abbey and that Abbey would hold that amount in escrow to apply against the $72,000 purchase price. Paragraph 6 of the agreement discusses Abbey's rights in the event Mr. Williams failed to pay amounts owed to Abbey. If he failed to pay before he executed a bill of sale transferring art to a charity, the agreement provides (also in paragraph 6) that Abbey's sole remedy was "to retain as liquidated damages all previous payments Client has made toward the purchase of the Art and, in addition, to reclaim ownership of the Art."[17] The draft agreement originally provided that, in the event that Mr. Williams failed to pay Abbey after he executed documents transferring art to a charity, Abbey could require specific performance, i.e., payment. However, Mr. Williams crossed out that sentence, and Abbey thus accepted the agreement without any explicit right to force Mr. Williams's payment.[18]

---

[17]From the documents in the record acknowledging the charities' receipt of the art, it appears that Abbey delivered art on loan to charities to hold until Mr. Williams signed and Abbey delivered the bill of sale or deed of gift. Abbey appears to have processed the final paperwork only after receiving Mr. Williams's payments for the art.

[18]Considering that Abbey controlled the paperwork, including the bill of sale or deed of gift, Abbey remained in a position to reclaim any art delivered on loan to a charity if Mr. Williams had defaulted on payment after Abbey delivered the art to a charity. But Mr. Williams was not obligated to proceed.

Because Mr. Williams had the power unilaterally to decide whether to pay the remainder of the $72,000 purchase price and execute a bill of sale, in effect his $3,600 payment purchased an option to buy art--with the full option price applied to the price of the art.

An option normally provides a person a right to sell or to purchase "'at a fixed price within a limited period of time but imposes no obligation on the person to do so'". See Elrod v. Commissioner, 87 T.C. 1046, 1067 (1986) (quoting Koch v. Commissioner, 67 T.C. at 82). "Options have been characterized as unilateral contracts because one party to the contract is obligated to perform, while the other party may decide whether or not to exercise his rights under the contract." Fed. Home Loan Mortg. Corp. v. Commissioner, 125 T.C. 248, 259 (2005). Although the agreement placed no time restriction on Mr. Williams's right to purchase the art, it also imposed no binding commitment on him to follow through with the purchase.

In contrast to an option agreement, "a contract of sale contains mutual and reciprocal obligations, the seller being obligated to sell and the purchaser being obligated to buy." Koch v. Commissioner, 67 T.C. at 82. The agreement at issue obligated Abbey to sell, but it did not obligate Mr. Williams to buy; thus, all he purchased in December 1996 was a contractual right to require Abbey to perform and to apply his $3,600 option

payment against the $72,000 total purchase price recited in the agreement. Even without a time limit on Mr. Williams's right to require performance, in substance the agreement was an option to purchase art, regardless of the title the parties gave to their agreement.

Mr. Williams's holding period for the art he had the option either to buy or not to buy did not begin until he exercised the option, committed himself to paying for the art, and acquired a present interest in the art. See Crane v. Commissioner, 45 T.C. 397, 404 (1966), affd. 368 F.2d 800 (1st Cir. 1966). In each instance, this occurred within less than a year of his donations.

Mr. Williams testified that oral discussions he had with Abbey before signing the agreement did obligate him to purchase roughly $800,000 of appraised art and that he intended that the initial commitment described in the agreement--$72,000 total payment to purchase art with roughly $300,000 of appraised value--would cover his 1997 donations, while he would pay additional amounts to donate the remaining art in subsequent years. He did not explain how any such oral agreement could have survived paragraph 12 of the agreement he and Abbey had executed, which stated that the agreement contains the entire agreement between him and Abbey. He also did not explain why Abbey would segregate $800,000 worth of art on the basis of his signing an agreement that required him to make a $3,600 deposit and pay the

remainder of the $72,000 total purchase price if and only if he chose to proceed.  Nor did he explain how an agreement for $300,000 of appraised-value art came to be an agreement for $800,000 of appraised-value art.

Mr. Williams testified that he asked Abbey to put together a collection of the kind of art he appreciated and that he believed Abbey had a large quantity of such art which Abbey would segregate and hold for his donation program.  Although he claims that he believed that Abbey segregated almost $1 million of art in its warehouse someplace in New York City, he did not have and did not even profess actual personal knowledge of the timing of Abbey's acquisition of the art.  He never requested or received an inventory of the items segregated on his behalf, and he never visited the warehouse to inspect the art purportedly purchased and set aside for his contribution program.[19]

Moreover, while it is clear from the age of the art listed in the appraisals that the pieces certainly existed long before their dates of donation, there is no evidence, aside from

---

[19]Mr. Williams also claimed that he believed the appraisals Abbey obtained were valid and accurate and that the 416-percent jump in value legitimately resulted from Abbey's purchasing the art oversees in third-world countries and in bulk.  Abbey's guaranteed appreciation is suspect; and if the art is available at such deep discounts, the appraisals--purporting to represent prices a willing buyer and willing seller would negotiate--are also suspect.  However, as the IRS is not challenging valuation, we need not decide these questions.

hearsay[20] and Mr. Williams's testimony, which is not competent on the point, that even Abbey owned any of this art before the dates of appraisals.

The evidence does not show that Mr. Williams owned the art as of the date of the initial agreement with Abbey in 1996 or at any other time earlier than a year before the donations. We find that Mr. Williams acquired a present interest in the art only when he agreed to pay Abbey for each batch of appraised art, and this occurred within less than a year of each donation. Thus, we agree with the IRS that because Mr. Williams owned the art for less than one year, he would not have been entitled to long-term capital gain treatment on any gain on the art if he had sold it, and therefore section 170(e)(1) limits his charitable contribution deduction to his basis in the art.

---

[20]Mr. Williams introduced a December 9, 2000, letter from Abbey asserting that Abbey still had items "held in a segregated manner in our warehouse located in New York City from 1997", promising to send a description of those remaining objects, and estimating the appraised value of the objects at over $200,000. If offered to prove the quoted fact, the letter is inadmissible hearsay, see Fed. R. Evid. 801(c), 802, and Mr. Williams did not offer into evidence any actual business records substantiating Abbey's holdings or any description of any segregated art, nor did he call any representative of Abbey to testify. Moreover, Mr. Williams did not reconcile Abbey's letter's reference to art segregated "from 1997" with his assertion that Abbey segregated all $800,000 of appraised-value art in 1996. We are entitled to infer from Mr. Williams's failure to offer evidence proving purchase in 1996 and segregation thereafter that probative evidence about the time of purchase and segregation would have been unfavorable to Mr. Williams's case. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

IV.  Accuracy-related penalty

The IRS determined that Mr. Williams is liable for accuracy-related penalties for the overstated charitable contribution deductions.  The Commissioner bears the burden of producing sufficient evidence showing the imposition of a penalty is appropriate.  Once the Commissioner meets this burden, the taxpayer must produce persuasive evidence that the Commissioner's determination is incorrect.  Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

A.  Negligence

Section 6662(a) and (b)(1) imposes an accuracy-related penalty equal to 20 percent of the portion of an underpayment that is attributable to the taxpayer's negligence or disregard of rules or regulations.[21]  Section 6662(c) provides that "the term

---

[21]The accuracy-related penalty is also imposed on the portion of an underpayment attributable to a "substantial understatement of income tax."  Sec. 6662(b)(2).  By definition, an understatement of income tax for an individual is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return.  Sec. 6662(d)(1)(A).

The understatements of income tax resulting from the disallowed charitable contribution deductions and the amounts of tax required to be shown on the returns follow:

(continued...)

'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard."  26 C.F.R. section 1.6662-3(b)(1)(ii), Income Tax Regs., provides that negligence is strongly indicated where a "taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances".  Negligence connotes a lack of due care or a failure to do what a reasonable and prudent person would do under the circumstances.  See <u>Allen v. Commissioner</u>, 92 T.C. 1, 12 (1989), affd. 925 F.2d 348 (9th Cir. 1991).  "[C]ourts have found that a taxpayer is negligent if he puts his faith in a scheme that, on its face, offers improbably high tax advantages, without obtaining an objective, independent opinion on its

---

[21](...continued)

|  | 1997 | 1999 | 2000 |
|---|---|---|---|
| Understatement of tax attributable to overstated charitable contribution | $128,096 | $68,522 | $21,600 |
| Tax required to be shown | 1,537,542 | 366,424 | 252,159 |

Although each understatement exceeds $5,000, only the understatement for 1999 is greater than 10 percent of the tax required to be shown on the return, and thus there is a substantial understatement for 1999 only.  We need address the substantial understatement accuracy-related penalty only to the extent we determine Mr. Williams is not liable for the negligence accuracy-related penalty under section 6662(b)(1).

validity." <u>Barlow v. Commissioner</u>, 301 F.3d 714, 723 (6th Cir. 2002), affg. T.C. Memo. 2000-339.

Commencing a holding period for hundreds of thousands of dollars of art donated in 1997, 1999, and 2000 by making a modest deposit in 1996 on an agreement that allowed Mr. Williams unfettered flexibility to chose whether or not to actually buy and donate any art at all was too good to be true. This manufactured tax benefit was enough to alert a reasonable and prudent person that additional scrutiny was required. Mr. Williams did not seek independent advice to verify the propriety of his Abbey agreement or the validity of the anticipated tax benefits. Accordingly, the negligence penalty applies.

B.   <u>Defenses</u>

A taxpayer who is otherwise liable for the accuracy-related penalty may avoid the liability if he successfully invokes one of three other provisions: Section 6662(d)(2)(B) provides that an understatement may be reduced, first, where the taxpayer had substantial authority for his treatment of any item giving rise to the understatement or, second, where the relevant facts affecting the item's treatment are adequately disclosed and the taxpayer had a reasonable basis for his treatment of that item. Third, section 6664(c)(1) provides that, if the taxpayer shows that there was reasonable cause for a portion of an underpayment

and that he acted in good faith with respect to such portion, no accuracy-related penalty shall be imposed with respect to that portion. Whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including his efforts to assess his proper tax liability, his knowledge and experience, and the extent to which he relied on the advice of a tax professional. 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs.

### 1. Substantial authority

Mr. Williams did not claim that he relied upon substantial authority holding that an option to purchase art with guaranteed appreciation would commence his holding period.

### 2. Disclosure and reasonable basis for treatment

The IRS does not dispute that Mr. Williams followed the procedural requirements for claiming the deductions for his charitable contribution deductions, and the IRS does not challenge the verification he provided with his returns. However, considering the contingent nature of Mr. Williams's obligation to purchase art from Abbey and the issue that raises about when he actually began to hold the art, we find that Mr. Williams's returns did not include sufficient facts to provide the IRS with actual or constructive knowledge of the potential controversy involved with Mr. Williams's deducting the

entire appraised value of the art he donated.  The adequate disclosure exception does not apply.

### 3.  Reasonable cause and good faith

Where reasonable cause existed and the taxpayer acted in good faith, section 6664(c)(1) provides a defense to the section 6662 penalty.  Generally, the most important factor is the extent of the taxpayer's effort to assess the proper tax liability. 26 C.F.R. sec. 1.6664-4(b)(1), Income Tax Regs.

For purposes of section 6664(c), a taxpayer may be able to demonstrate reasonable cause and good faith (and thereby escape the accuracy-related penalty of section 6662) by showing his reliance on professional advice.  See sec. 1.6664-4(b)(1), Income Tax Regs.  However, reliance on professional advice is not an absolute defense to the section 6662(a) penalty.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  A taxpayer asserting reliance on professional advice must prove:  (1) that his adviser was a competent professional with sufficient expertise to justify reliance; (2) that the taxpayer provided the adviser necessary and accurate information; and (3) that the taxpayer actually relied in good faith on the adviser's judgment.  See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Mr. Williams testified that his return preparer advised him that, given appropriate appraisals and a 1-year holding period, his charitable contribution deductions "shouldn't be an issue". The record includes no evidence on the return preparer's qualifications nor on what information Mr. Williams gave his return preparer in order to obtain his approval of the deduction. Mr. Williams did not testify whether he provided a copy of the agreement, explained to the preparer the contingent nature of his obligation to purchase, or admitted his lack of knowledge of whether Abbey actually owned the art more than a year before his contributions.

Mr. Williams testified that he believed Abbey's appraisals were legitimate, that the promised appreciation of the art resulted from Abbey's economies of scale from bulk purchases, and that his return preparer approved the deductions. We need not decide--though we doubt--whether Mr. Williams honestly held these beliefs; it is enough that he failed to demonstrate that he provided a competent tax professional all the information about his deal with Abbey and that he actually relied upon an objective professional's advice rather than his perception of the deal or Abbey's representation of the tax deductions it could manufacture for him.

The reasonable cause exception does not apply.

Mr. Williams is therefore liable for the accuracy-related penalty on the underpayments resulting from the disallowed charitable contribution deductions for 1997, 1999, and 2000.

V.    Conclusion

Mr. Williams is liable for tax in each year on the investment income earned in the ALQI accounts because, as the parties have agreed, that income is foreign personal holding company income, pursuant to section 954(a)(1). He is also liable for tax in each year on the net consulting income paid into the ALQI accounts because that income was his own. Moreover, Mr. Williams is liable for the civil fraud penalty under section 6663(a) on the entire underpayment resulting from his unreported ALQI income (both investment income and consulting income) for each year in issue.

Mr. Williams is not entitled to charitable contribution deductions in excess of those the IRS allowed, and he is liable for the accuracy-related penalties under section 6662(a) and (b)(1) on the underpayments resulting from the disallowed charitable contribution deductions.

To reflect the foregoing,

An appropriate order and decision will be entered.